**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**ABILENE DIVISION**

| | |
|---|---|
| CORTNEY D. TANNER,<br>Plaintiff,<br><br>v.<br><br>CDT EQUITY INC., formerly known as CONDUIT PHARMACEUTICALS INC., and ANDREW REGAN,<br>Defendants. | Civil Action No. 1:26-cv-577<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934 AND JURY DEMAND**

Plaintiff Cortney D. Tanner, also known as Cort D. Tanner, brings this individual action and alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff Cortney D. Tanner, also known as Cort D. Tanner, is a 100% service-connected disabled United States military veteran. Over approximately ten years, he accumulated savings from Department of Veterans Affairs disability compensation. In February 2025 he began investing in Conduit Pharmaceuticals Inc., now CDT Equity Inc. (the "Company" or "CDT"), a publicly traded pharmaceutical-development enterprise. He understood its public statements about drug assets, patents, licensing, research, and financial resources to describe a business capable of pursuing that work. He committed savings, actively managed the position, and continued buying as the Company announced progress. He now holds three whole shares. Schwab reported $157,932.43 in combined realized and unrealized loss on the carried CDT position as of September 30, 2026. Plaintiff reports that the three shares together are now worth

less than $0.25. The updated accounting calculation and the damages sought are set out in paragraphs 89–94. (Ex. B, pp. B-1–B-4.)

2. The principal claim challenges a repeated, affirmative description of CDT's ability to fund twelve months of working-capital requirements from existing cash and current borrowings. That description appeared in the 2024 Form 10-K filed March 28, 2025, the first-quarter 2025 Form 10-Q filed May 15, and the second-quarter 2025 Form 10-Q filed August 14. In the same reports, management disclosed that existing liquidity was insufficient to fund its business plan and that additional, uncommitted financing was required. The complaint identifies the words, dates, makers, quantitative context, and November 2025 change in the Company's working-capital formulation. It challenges the present-resource implication of the statements, not merely disappointing pharmaceutical results or a declining share price.

3. CDT expressly disclosed operating losses, liquidity shortfalls, the need to raise debt or equity, potential dilution, and substantial doubt about its ability to continue as a going concern. Plaintiff does not allege those matters were concealed. His allegation is that the simultaneous affirmative description of existing funding capacity was misleading in light of management's own determination, the difference between cash on hand and future market-dependent stock sales, and the Company's detailed financing figures. The complete financial disclosures, including their adverse warnings, are part of the challenged context.

4. Plaintiff does not challenge reverse splits merely because they occurred. He sets out each split because the sequence explains how a continuing shareholder’s holdings came to be represented by three whole shares. His claims concern materially misleading financial representations and the loss attributable to them, not a guarantee that a speculative biotechnology investment would succeed.

5. Plaintiff brings an individual action under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) against CDT and, for the specified reports he signed and approved, Andrew Regan. Plaintiff also asserts controlling-person liability under Section 20(a) against Regan and, in the alternative, a claim under Section 18(a) concerning the first-quarter 2025 Form 10-Q on which he personally relied. This is neither a class action nor a shareholder derivative action. Plaintiff seeks one nonduplicative recovery for legally compensable loss, together with interest and taxable costs.

6. Allegations concerning Plaintiff's conduct and investment purpose are based on his personal knowledge and brokerage records. Allegations concerning the Company and its management are based on the identified SEC filings, filed agreements, Company announcements, and the reasonable inferences expressly drawn from those materials. "CDT" and the "Company" refer to the same issuer before and after its change of name from Conduit Pharmaceuticals Inc.

## II. PARTIES, JURISDICTION, AND VENUE

7. Plaintiff Cortney D. Tanner, also known as Cort D. Tanner, resides in Abilene, Taylor County, Texas. His mailing address is P.O. Box 9669, Dyess Air Force Base, Texas 79607. The Charles Schwab brokerage records identify the account holder as Cortney D. Tanner. Plaintiff placed CDT trades through his individual U.S. brokerage account while located in Abilene, Texas.

8. Defendant CDT Equity Inc., formerly Conduit Pharmaceuticals Inc., is the SEC registrant identified by CIK 0001896212 and Commission File No. 001-41245. Its September 25, 2026 Form 8-K identifies Delaware as its jurisdiction of incorporation and 4851 Tamiami Trail North,

Suite 200, Naples, Florida 34103 as its principal executive offices. Its common stock traded on Nasdaq under the symbol CDT. (SEC accession 0001493152-26-044248, cover.)

9. Defendant Andrew Regan became CDT's chief executive officer effective April 15, 2025 and served as a director during the relevant period. He signed the first- and second-quarter 2025 reports containing the challenged language and executed principal-executive certifications concerning his review of those reports and responsibility for disclosure controls. CDT appointed James Bligh chief executive officer effective August 31, 2026; its October 27, 2026 Form 8-K identifies Regan as a former chief executive officer and former director. Regan's direct liability alleged here concerns the May and August 2025 reports, and his controlling-person liability concerns violations during his period of control. (SEC accessions 0001641172-25-005036, 0001641172-25-010405, 0001641172-25-024140, 0001493152-26-040929, and 0001493152-26-048638.)

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The claims arise under 15 U.S.C. §§ 78j(b), 78r(a), and 78t(a), and 17 C.F.R. § 240.10b-5(b). The securities transactions at issue were purchases of Nasdaq-traded common stock through a United States brokerage account, not purchases on a foreign exchange.

11. CDT disseminated the challenged disclosures through SEC filings and investor communications to the United States securities market. The challenged securities were listed on Nasdaq, and Plaintiff purchased through his individual United States brokerage account. Regan personally signed and certified the identified reports for SEC filing during his tenure as CEO. The alleged conduct used interstate communications and securities-market facilities, and Plaintiff invokes the nationwide service provision of Section 27 of the Exchange Act.

12. Venue is alleged under Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a). Plaintiff received and evaluated the electronically disseminated Company disclosures in Abilene and placed the allegedly affected purchase orders from Abilene through interstate brokerage facilities. Those communications and purchase decisions formed part of the alleged transaction sequence. Taylor County is within the Abilene Division of the Northern District of Texas.

## III. PLAINTIFF'S INVESTMENT AND RELIANCE

13. Plaintiff's first documented acquisition was 5,000 shares on February 3, 2025, for a net debit of $10,996.17, settling February 4. He had encountered the Company through his own research on Schwab's website. No individual broker or Company representative personally recommended that he buy the stock. Later announcements are not alleged to have induced this earlier purchase. (Schwab February 3, 2025 trade confirmation and February 2025 statement.)

14. Plaintiff followed the Company's press releases and SEC disclosures concerning its autoimmune pipeline, scientific work, patent portfolio, debt reduction, artificial-intelligence collaboration, licensing plans, and Nasdaq compliance. He considered those matters together when deciding whether to commit additional money. His premise was that the Company's public description of its business and resources was materially accurate.

15. The March 31, 2025 announcement of U.S. patent approval concerning AZD1656 was particularly important to Plaintiff. He understood the developing patent portfolio to enhance the assets' licensing potential and increased his investment thereafter. His expectation of commercial progress did not depend on a guaranteed date for product sales or licensing receipts. (Company release, March 31, 2025.)

16. Plaintiff materially relied on the April 10, 2025 repurchase announcement as management's expression of confidence that CDT was undervalued and had financial resources

supporting that judgment. He understood the board's action to authorize repurchases of up to $1 million, rather than guarantee expenditure of the entire amount. The announcement's reference to existing cash reserves was part of the financial message he considered when making subsequent purchases.

17. The April 2025 Schwab excerpt shows active turnover: sales dated April 11 totaling 113,500 shares; further sales dated April 14 totaling 21,500 shares; and seven purchase entries dated April 14 totaling 96,500 then-current shares and $103,383.08 in purchase debits, including a 50,000-share fill at $1.18 for $59,000. The April 14 entries follow CDT's April 10 public announcement of a discretionary share-repurchase authorization of up to $1 million, but precede the May 15 first-quarter Form 10-Q and Regan's assumption of the CEO role. Plaintiff identifies this April buying, to the extent actionable, with the preceding Company disclosures rather than attributing it to a report published afterward. The sales and repurchases were part of his active management of the position; the gross purchase debits are not an additional, nonduplicative loss calculation. The excerpt's transaction-date column does not separately establish the orders' execution dates. (Ex. B, p. B-6; Ex. A, pp. A-22-A-23.)

18. The May 2025 Schwab excerpt identifies purchases dated May 16 (2,348 shares, $903.98), May 19 (100 shares, $38.75), and May 20 (150 shares over two entries, $54.33); those entries total $997.06. It also identifies a May 27 purchase of one post-split share for $3.39. Because a 1-for-15 reverse split occurred in between, the pre-split and post-split share quantities are not directly additive. These entries follow the public filing of the first-quarter 10-Q on May 15, but the statement alone does not identify the precise execution dates. Plaintiff personally read CDT's May 15, 2025 Form 10-Q before making additional purchases. He considered and relied on its Working Capital discussion of financing, available capital, and liquidity, including the

affirmative description of the ability to meet twelve months of working-capital requirements, in the context of its cautionary disclosures. He understood the reported existing resources to be materially more dependable than proceeds from uncommitted future sales of stock or borrowing. The report's positive current-resource presentation formed part of his decision to add shares alongside the share repurchase announcement, management and related-party information, and pharmaceutical and licensing prospects. Additional purchases followed in June, August, September, November, and December. Broker statement dates are transaction or processing dates unless a trade confirmation establishes execution; Plaintiff does not equate statement and trade dates. (Schwab statements; Ex. B, pp. B-6-B-9.)

19. The August 2025 non-reliance disclosure increased Plaintiff's concern, but he initially understood it as an accounting issue that could be corrected. He viewed depressed prices as a potential buying opportunity in light of subsequent favorable announcements and continued averaging down. His concerns did not immediately displace the pharmaceutical, intellectual-property, and licensing thesis on which he had invested.

20. Regan's publicly described business background and ownership interests reinforced Plaintiff's confidence. Plaintiff originally viewed the relationships among CDT, Regan, Sarborg, and Manoira favorably, believing they could bring resources and commercial opportunities to CDT. His claim is not that every relationship was undisclosed; it concerns the financial picture communicated and the economic substance of the transactions.

21. Plaintiff made substantial additional purchases through December 2025, followed by smaller purchases in the first quarter of 2026. He has made no voluntary CDT sales since December 2025. The later purchase entries and corporate-action adjustments remain part of the investment history.

22. The March 2026 statement records 555 shares purchased for $349.65 on a March 3 settlement/process date and 940 shares purchased for $526.40 on a March 16 settlement/process date. The combined expenditure was $876.05. Plaintiff made these smaller purchases to manage the existing position and avoid fractional-share loss associated with anticipated reverse-split treatment, not as another substantial speculative commitment. The separate March 27 corporate-action entry exchanged 19,000 shares for 760 shares. (Ex. B, p. B-4.)

## IV. SIX REVERSE SPLITS AND THE CONTINUING POSITION

23. CDT completed six reverse splits between January 2025 and September 2026. The January split preceded Plaintiff's first documented acquisition; the remaining five took place while he owned CDT. The ratios multiply to 75,000,000:1 across all six, and 750,000:1 across the five post-acquisition splits. Those figures refer to hypothetical continuity of share units, not the percentage of Plaintiff's actual economic loss or of the changing position that included intervening transactions. Plaintiff opposed the stockholder authorizations for reverse splits he was entitled to vote on. Because the Company's proxies sometimes sought advance authority for multiple future splits, the references below to his votes concern the shareholder authorization proposals, not necessarily separate elections on each later board-selected ratio.

24. On January 24, 2025, at 5:00 p.m. Eastern Time, CDT effected a 1-for-100 reverse stock split. Every 100 outstanding common shares were combined into one, subject to fractional-share treatment. Split-adjusted trading began January 27, 2025. Plaintiff's first purchase followed on February 3. (January 23, 2025 Form 8-K, accession 0001493152-25-003316, Item 5.03.)

25. On May 19, 2025, at 5:00 p.m. Eastern Time, CDT effected a 1-for-15 reverse stock split. Every 15 outstanding common shares were combined into one, subject to fractional-share treatment. Split-adjusted trading began May 20. The May 16 Form 8-K states that stockholders

approved the authorizing proposal at the May 5 special meeting, giving the board authority to select the precise ratio and effective date. Plaintiff reports that he voted against the reverse-split authorization. (SEC accession 0001641172-25-011183; May 2025 proxy, accession 0001641172-25-006259.)

26. On October 10, 2025, CDT effected a 1-for-8 reverse stock split, with split-adjusted trading beginning October 13. Plaintiff reports that he voted against the shareholder authorization used for the proposed reverse split; he does not claim that the later board-selected ratio necessarily received its own separate shareholder ballot. (SEC accession 0001493152-25-017533, Item 5.03.)

27. On March 26, 2026, CDT effected a 1-for-25 reverse stock split. Split-adjusted trading began March 27, when Schwab removed 19,000 of Plaintiff's shares and credited 760. Plaintiff reports opposition and an adverse vote on the pertinent reverse-split shareholder authorization, to the extent he was entitled to vote on the proposal. (SEC accession 0001493152-26-012538; Ex. B, p. B-4.)

28. On July 17, 2026, CDT effected a 1-for-10 reverse stock split. Split-adjusted trading began July 20. A continuing 760-share block became 76 shares. Plaintiff reports that he opposed and voted against the shareholder authorization for further reverse splits, without alleging a separate shareholder vote on every ratio later chosen by the board. (SEC accession 0001493152-26-033455; Ex. B, p. B-3.)

29. On September 28, 2026, CDT effected a further 1-for-25 reverse split. Split-adjusted trading began September 29, when Schwab removed Plaintiff's 76 shares and credited three whole shares; on September 30 it credited $0.08 cash in lieu of a fractional entitlement. Plaintiff reports that he voted against the applicable stockholder authorization for additional reverse splits;

the company states the later ratio and implementation were selected under previously approved board authority. (SEC accession 0001493152-26-044248; Ex. B, p. B-3.)

30. Thus, the March-to-September sequence reduced the recorded position from 19,000 shares to 760, then 76, then three whole shares. The September redemption was a fractional-share payment, not a voluntary liquidation of those three shares. Plaintiff remained an owner while the form and quoted value of his ownership changed.

31. The five post-purchase consolidation ratios multiply to 750,000-to-one (a 99.9998667% theoretical reduction in share units for an unchanged block, before fractional-share treatment). That arithmetic makes the succession of corporate actions intelligible without attributing every share lost in a split to a dollar loss. CDT itself connected capital restructuring with financing: its October 9, 2025 split announcement said the board expected the action to facilitate further fundraising for its strategy. The financial loss is calculated separately. (Company reverse-split release, October 9, 2025.)

## V. SPECIFIC FINANCIAL REPRESENTATIONS AND WHY THEY WERE MISLEADING

### A. Existing funding resources in the March 2025 annual report

32. On October 23, 2024, CDT entered an at-the-market sales agreement with A.G.P. under which it could sell common stock from time to time. The stated offering capacity was $23.9 million. The arrangement made market sales of additional shares an identified source of operating capital. Plaintiff does not allege that the existence of this agreement was secret. (2024 Form 10-K, accession 0001641172-25-001246, financing and subsequent-event disclosures.)

33. The annual report filed March 28, 2025 stated that CDT expected approximately $22.9 million of working-capital requirements for the following twelve months. The same Working Capital section said: "We do anticipate being able to fund required working capital for the next

12 months with cash and cash equivalents on hand and current borrowings." The $22.9 million included forecast research and development, operating expenses, current liabilities, convertible notes, and loans. Then-CEO David Tapolczay and interim CFO James Bligh signed the annual report. (2024 Form 10-K, SEC accession 0001641172-25-001246, MD&A, printed p. 64, and signatures.)

34. The next sentences stated management's belief that the required cash would be obtained through borrowing and equity raises, including further at-the-market (ATM) stock sales. CDT reported approximately $12.0 million of remaining ATM offering capacity as of the financial-statement issuance date. Plaintiff pleads those qualifications expressly. Authorized offering capacity was an opportunity to seek future market financing, not cash already collected or an unconditional commitment by any lender or purchaser. The asserted half-truth concerns the distinction between resources already available and additional financing that the Company hoped to obtain.

35. The annual report separately stated that December 31, 2024 cash and short-term investments were approximately $0.6 million, the 2024 net loss was approximately $17.8 million (and the operating loss was approximately $15.4 million), and operating activities had used approximately $9.7 million in cash. Note 1 expressly recorded management's determination that the Company did not have sufficient cash and other liquidity to fund its then-current business plan, and that additional financing beyond the remaining ATM capacity was needed. It stated that these conditions raised substantial doubt about going concern. The December 31 balance is not alleged to be the exact cash balance on March 28. (Id., balance sheet, Note 1, and cash flows.)

36. The juxtaposition was material to the capacity representation. Against $22.9 million of forecast requirements, the report identified only approximately $0.6 million of year-end cash and approximately $12 million of remaining potential ATM sales at issuance, while management itself said available sources were insufficient. Even complete future realization of the stated remaining ATM capacity was not equivalent to present cash or already-available borrowing commitments. Plaintiff alleges that the positive sentence described a present resource base that the same report's quantitative figures and management assessment did not support, and that a reasonable investor could consider that distinction important to financing and dilution risk.

37. Plaintiff does not allege an actionable pure omission or infer that a risk warning was never given. He identifies the affirmative sentence about existing cash and borrowings and alleges it was a misleading half-truth when read with the Company's own contrary assessment. He acknowledges that a forward-looking expectation about raising capital and cautionary disclosures surrounded the sentence; the alleged present-tense representation cannot be evaluated in isolation from that complete disclosure.

**B. The April 10 repurchase communication**

38. On April 10, 2025, CDT announced that its board had authorized a discretionary repurchase program of up to $1 million. The release conveyed the board's belief that the prevailing stock price did not reflect underlying value; then-chief executive David Tapolczay stated that the program would use "existing cash reserves." (Company release, "Conduit Pharmaceuticals Announces Up to $1,000,000 Share Repurchase Program," April 10, 2025.) Plaintiff alleges that this affirmative present-cash framing reinforced the misleading impression alleged from the prior working-capital discussion; a repurchase authorization alone was not a promise of a particular volume of repurchases.

39. The authorization was discretionary, and the release allowed liquidity and other circumstances to affect repurchases. Actual repurchases occurred. Later reporting recorded 1,464 split-adjusted repurchased shares at an average price of $70.80, plus commissions. Plaintiff's allegation concerns the financial premise conveyed by the existing-cash description, not a failure to carry out a mandatory $1 million repurchase. (Q3 2025 Form 10-Q, Note 10.)

40. Plaintiff challenges the current-financial-capacity impression conveyed by the cash-reserve description in conjunction with the earlier funding statement. Management had already identified a financing shortfall, ongoing operating losses, and a need for further capital. Plaintiff alleges that the affirmative financial framing materially understated the present dependence on stock issuance that stood behind the Company's expression of confidence.

41. This issue bears directly on Plaintiff's purchases following the announcement. He understood management's confidence to rest on the Company's financial circumstances as well as its scientific prospects. The allegation is not that every expression of undervaluation is actionable. It is that the specified present-resource framing supplied a materially misleading factual basis for the investment signal on which he relied.

**C. Repetition in the first- and second-quarter reports**

42. The first-quarter 2025 Form 10-Q was signed May 14, accepted by EDGAR that evening, and assigned an official filing date of May 15, 2025. Regan signed as CEO, and James Bligh signed as interim CFO. In its Working Capital section the report estimated approximately $12.7 million of cash requirements for the ensuing twelve months and again stated: "We do anticipate being able to fund required working capital for the next 12 months with cash and cash equivalents on hand and current borrowings." (Form 10-Q, SEC accession 0001641172-25-010405, printed p. 33, submission header, and signatures.)

43. The immediately following sentence anticipated future borrowing and equity raises, including further ATM transactions, and the same report disclosed substantial going-concern uncertainty. Note 1 again said management had determined that cash and other liquidity were insufficient to fund the current business plan and that additional funding was needed even in light of the remaining ATM program. Plaintiff alleges that such uncommitted future proceeds were not equivalent to the current cash-and-borrowings funding capacity conveyed by the challenged sentence. (Id., Note 1, Working Capital.)

44. For the March 31, 2025 quarter, CDT reported approximately $2.1 million in cash and cash equivalents, approximately $5.1 million in net losses, and approximately $4.3 million of operating cash use. The forecast requirement was approximately $12.7 million; approximately $12 million of ATM capacity remained at issuance, but any future sale still depended on market access and execution. The same report described the existing liquidity shortfall. These figures and funding judgments were central financial matters in the report Regan signed and certified. (Id., balance sheet, Note 1, MD&A, cash flows, and signatures.)

45. The second-quarter Form 10-Q signed by Regan and Bligh on August 14, 2025 again estimated approximately $12.7 million of next-year requirements and retained the affirmative sentence that cash and current borrowings would fund them, even as the related financing schedule and the Company's disclosed position changed. As in the preceding reports, the following text anticipated future borrowings and equity raises. (Form 10-Q, SEC accession 0001641172-25-024140, Working Capital, signatures.)

46. The August report identified approximately $3.3 million in June 30 cash and cash equivalents, a $10.8 million loss over six months, $6.5 million of cash used by operations, and approximately $8.2 million in ATM capacity remaining at issuance. Cash plus the entire stated

future ATM capacity would have been approximately $11.5 million, below the report's $12.7 million forecasted requirements, before any financing fees or changes in operations. This comparison does not presume that ATM shares would actually be sold or establish the absence of every possible future loan. More decisively, management itself stated that existing liquidity was insufficient and additional financing was required beyond remaining ATM availability. Plaintiff alleges that those contemporaneous facts rendered the repeated current-resource sentence misleading. (Id., Note 1, balance sheet, cash-flow statement, and Working Capital.)

47. For an issuer pursuing research and licensing without an established stream of operating revenue, the resources available to finance that work were material to an investment decision. The distinction affected the prospect of additional issuance, the capital available for development, and the meaning of the Company's repurchase communication. Plaintiff alleges a substantial likelihood that accurate information on those subjects would have changed the total mix of information on which he acted.

48. The following comparison uses the amounts as reported for each identified period. A financial-statement-date cash balance is not represented as the cash balance on the later filing date. Likewise, remaining authority to sell shares under the ATM program was contingent market financing, not cash on hand or a committed borrowing facility. This comparison does not exclude the possibility of later financing; it identifies the contemporaneous basis for challenging a statement expressly referring to cash on hand and current borrowings. (2024 Form 10-K, accession 0001641172-25-001246, Working Capital and Note 1; Q1 2025 Form 10-Q, accession 0001641172-25-010405, Working Capital and Note 1; Q2 2025 Form 10-Q, accession 0001641172-25-024140, Working Capital and Note 1.)

| SEC filing | 12-month need | Reported cash | Other contemporaneous disclosure |
|---|---|---|---|
| 2024 Form 10-K March 28, 2025 | $22.9 million | $0.6 million Dec. 31, 2024 | Approx. $12.0 million unused ATM at issuance; Note 1 found the current business plan could not be funded from available liquidity, even with ATM sales. |
| Q1 Form 10-Q May 15, 2025 | $12.7 million | $2.1 million Mar. 31, 2025 | Approx. $12.0 million gross ATM capacity remained; Note 1 described insufficient liquidity and the need for additional funding. |
| Q2 Form 10-Q Aug. 14, 2025 | $12.7 million | $3.3 million June 30, 2025 | Note 1 listed approx. $8.2 million of remaining ATM authority at issuance and required additional financing beyond that potential capacity. |

## VI. DISCLOSED REGAN-RELATED ENTITIES AND BUSINESS CONTEXT

### A. Ownership, management, directorships and contractual links

49. Regan co-founded Conduit Pharmaceuticals Limited, the operating company that combined with the public registrant in the September 2023 transaction; he served on the resulting public company's board beginning in 2023 and became CDT's chief executive officer on April 15, 2025. The registrant and Conduit Pharmaceuticals Limited were distinct legal entities. During the relevant May and August 2025 reporting periods, Regan both led CDT and held the additional relationships described below. (2024 Form 10-K, accession 0001641172-25-001246, Directors and Executive Officers; Q2 2025 Form 10-Q, accession 0001641172-25-024140, Note 11.)

50. Corvus Capital Limited ('Corvus') was founded by Regan, who was its chief executive officer and principal owner. Corvus owned CDT securities and was a significant investor in the predecessor transaction. CDT's 2024 beneficial-ownership disclosure also identified Algo Holdings, Inc. as wholly owned by Corvus and described shares held through Corvus and Algo as shares that could be attributed beneficially to Regan, subject to the stated disclaimer of

beneficial ownership beyond his pecuniary interest. This is a disclosed ownership chain; it does not establish that Corvus, Algo, and CDT were a single legal entity. (2024 Form 10-K, accession 0001641172-25-001246, beneficial-ownership table, note (6); Q2 2025 Form 10-Q, accession 0001641172-25-024140, Note 11.)

51. Sarborg Limited ('Sarborg') was an identified related-party services counterparty. CDT disclosed that Regan sat on Sarborg's board of directors, but explicitly stated he did not hold an equity interest in Sarborg. The Company entered services arrangements with Sarborg in December 2024 and March 2025, involving cash payments, shares, and development or analytical services; the first-quarter report identified about $1.5 million of stock consideration issued to prepay additional services. Plaintiff does not allege Regan personally owned Sarborg or received all consideration paid to it. (Q1 Form 10-Q, accession 0001641172-25-010405, related-party transactions; Q2 Form 10-Q, accession 0001641172-25-024140, Note 11.)

52. Manoira Corporation ('Manoira') was described by CDT as an entity controlled by Regan; he was identified as a director and controlling member. In June 2025, CDT entered a joint-development agreement with Manoira, delivered CDT shares valued at approximately $0.5 million, and granted a non-exclusive, fully paid-up, royalty-free license for defined animal-health evaluations involving AZD1656 and AZD5658. In October 2026, CDT described Regan as Manoira's sole director in a subsequent, separately disclosed transaction. These statements support control and governance relationships, not an invented claim that he received the transaction's entire value personally. (Q2 Form 10-Q, accession 0001641172-25-024140, Notes 6 and 11; October 27, 2026 Form 8-K, accession 0001493152-26-048638.)

53. Nirland Limited ('Nirland') was a separate investor and financing counterparty, treated as a CDT related party in the company's filings because of its share ownership. The Q2 2025 Form

10-Q reported that Corvus and its affiliates entered a participation and inducement arrangement with Nirland in connection with the 2023 financing, under which certain Corvus-held CDT shares could become transferable to Nirland on stated conditions. Plaintiff does not allege that Nirland was owned or controlled by Regan. (Q2 Form 10-Q, accession 0001641172-25-024140, Note 11.)

54. Conduit Pharmaceuticals Limited ('CPL') was an operating subsidiary of the public registrant during the May and August 2025 statements. On December 8, 2025, after the alleged November correction, CDT disclosed the sale of CPL to Corvus, together with issuance of 224,800 CDT shares and 3,685,815 prefunded warrants to Corvus under an arrangement described as a $7 million settlement relating to CPL and litigation. This later transaction is relevant to the identity of the entities, their financial ties, and capital-allocation context, not proof by itself of Regan's state of mind when he signed the May and August reports. (December 8, 2025 Form 8-K, accession 0001493152-25-027489, Item 1.01.)

55. These relationships were publicly disclosed. The transactions may inform the context of management's financing decisions, conflicts of interest, and which officers were positioned to monitor available resources, but affiliation alone is not pleaded as fraud. Plaintiff does not allege undisclosed ownership, unlawful diversion of funds, or an alter-ego relationship without particular supporting evidence. The challenged representations remain the specific current-resource statements in the 2024 Form 10-K and the May and August 2025 Forms 10-Q.

**B. Business narrative and related-party capital allocations**

56. The Company’s investor communications described a continuing program of pharmaceutical and technological progress. They included a March 31, 2025 U.S. patent announcement; the April 16 leadership announcement emphasizing licensing and shareholder

value; and later scientific, AI, and animal-health initiatives. Plaintiff followed those developments. The principal financial misstatements identified above were communicated against that background, rather than as an isolated financial exercise.

57. In the April 16, 2025 leadership announcement, Regan stated: "We will maximise shareholder value at Conduit through licensing opportunities." The announcement linked that strategy to patents and the Sarborg collaboration. Plaintiff regarded the combination of leadership, assets, and financing as an investment thesis. This statement describes the context of his reliance; it is not pleaded as a guarantee that any license would close by a particular date. (Company leadership release, April 16, 2025.)

58. CDT committed resources to Sarborg during the same period. The March 31, 2025 arrangement concerned further analysis of pharmaceutical data. The first-quarter report disclosed 1,853,933 shares issued to Sarborg with a recorded value of approximately $1.5 million, treated as prepaid research and development. Those disclosed uses of capital supply context for the Company's financing needs; they are not alleged to have been undisclosed simply because the recipient was related. (Form 10-Q, accession 0001641172-25-010405, prepaid R&D and related-party disclosures; filed Sarborg agreement.)

59. The June 2025 Manoira transaction involved animal-health development, share consideration from CDT, and a development license. The Company disclosed Regan's relationship to Manoira. The license was royalty-free for its defined rights and did not itself authorize commercial product sales. Plaintiff had originally viewed the relationship favorably; he later assigned less weight to the announcement as he better appreciated its economics. (June 9, 2025 Form 8-K, accession 0001641172-25-014322, Item 1.01 and Ex. 99.1.)

60. The August 14, 2025 Form 8-K reported an August 8 determination that previously issued first-quarter financial statements should not be relied upon. The identified issue was the classification of $400,000 of Sarborg milestone payments as R&D expense rather than an acquired diagnostic asset. This was an actual reporting correction. It is not alleged to be an admission that CDT invented revenue, performed no scientific work, or had no patents. (Accession 0001641172-25-023840, Item 4.02.)

61. The third-quarter 2025 report disclosed approximately $18 million in net ATM proceeds during the first nine months. It also reported 1,464 split-adjusted shares repurchased at an average of $70.80 and approximately $2,000 in commissions. Earlier reports used pre-adjustment share quantities for the same activity. The contrast identifies the scale of issuance and repurchases; it does not convert authorization of a discretionary buyback into an obligation to spend $1 million. (Form 10-Q, accession 0001493152-25-022373, Note 10.)

62. On December 8, 2025, CDT disclosed a sale of its subsidiary Conduit Pharmaceuticals Limited to Corvus Capital Limited, the Regan-affiliated entity described above. The Company issued 224,800 CDT common shares and 3,685,815 prefunded warrants to Corvus in connection with an arrangement described as a $7 million settlement involving the subsidiary and its litigation. The filing did not report $7 million of cash financing received by CDT. The relationship and consideration were disclosed, and the transaction postdated the challenged May and August statements. Plaintiff cites it for subsequently disclosed entity and capital-allocation context, not as a freestanding concealed transaction or as direct proof of 2025 scienter. (Form 8-K, accession 0001493152-25-027489, Item 1.01.)

63. Later filings reflected additional dependence on financing and increased issued shares. The October 13, 2026 Form 8-K described a senior secured convertible financing arrangement

67. The pharmaceutical, patent, licensing, and related-party announcements explain the investment setting and the importance of funding to the development strategy. The challenged statements are the identified financing representations. Their alleged falsity is tied to contemporaneous management assessments, rather than inferred solely from later disappointment or reverse splits.

## VII. FACTS SUPPORTING KNOWLEDGE OR SEVERE RECKLESSNESS

68. Plaintiff alleges the following interrelated facts in support of a strong inference that the makers of the identified financial reports knew, or were severely reckless about, the misleading present-resource component. The inference rests on contemporaneous information published by the Company and the particular officers' reporting acts, not simply their positions, adverse investment results, or the occurrence of lawful reverse stock splits.

69. First, management's own explicit insufficiency determination appeared in Note 1 of the reports carrying the positive cash-and-current-borrowings sentence. This is not a later outside allegation that management failed to anticipate losses; it is a contemporaneous judgment about its funding that was prepared and published by CDT itself. The alleged inconsistency is especially salient because the two formulations addressed the same twelve-month ability to finance the business plan.

70. Second, CDT repeated substantially the same affirmative formulation in three reporting periods while revising its cash balances, working-capital requirements, remaining ATM capacity, and actual financing activity. The May and August 2025 reports were signed by Regan after his April 15 CEO appointment. The affirmative wording remained even when June 30 cash and remaining ATM capacity were quantified against an updated $12.7 million requirement. In November 2025, the Company changed the same sentence to state the opposite expectation.

71. Third, the statements concerned a core constraint that management was actively measuring and addressing through ATM stock sales, convertible-note transactions and other financing. The 2024 annual report described operating cash use of approximately $9.7 million; the first-half 2025 report described $6.5 million of operating cash use. Plaintiff alleges that knowledge of existing liquidity and the difference between realized cash and authorized future issuances was integral to the management decisions publicly described in those same filings.

72. In the August 14, 2025 Form 10-Q, CDT affirmatively identified Regan as its chief operating decision maker. Note 15 states that he managed the single operating segment, assessed consolidated financial performance, reviewed budget-to-actual variances, and decided how to allocate resources. This specifically ties Regan to the cash needs, net losses, and financing decisions at issue, beyond his office or execution of a certification. The same report contained Note 1's inadequate-liquidity determination and the challenged affirmative Working Capital sentence. Plaintiff does not assert that this segment-reporting designation proves Regan's mental state without the remaining contemporaneous facts. (Q2 2025 Form 10-Q, accession 0001641172-25-024140, Note 15, Working Capital, and Note 1.)

73. The April 10 communication used the present-cash description after the annual report had identified inadequate liquidity. Regan subsequently signed the quarterly reports maintaining the funding formulation. The alleged awareness arises from those acts and the specific financial assessments within the reports, considered together with the certifications described next.

74. Fourth, Regan executed the May and August 2025 principal-executive certifications stating that he had reviewed the quarterly reports and addressing their material-accuracy and disclosure-control responsibilities. His signature and certifications connect him personally to the reports that repeatedly presented the challenged sentence alongside Note 1's liquidity

assessments. Plaintiff does not assert that a Section 302 certification, without the specific circumstances described here, proves scienter. (Exhibits 31.1 to Forms 10-Q, SEC accessions 0001641172-25-010405 and 0001641172-25-024140.)

75. The alleged inference is that repeated approval of a positive description of already-available financing, in the face of management's express contrary assessment and a changing, quantified financing position, was knowing or severely reckless rather than an isolated miscalculation. Regan's involvement is limited to the two reports he signed and certified as chief executive. Plaintiff recognizes that management also publicly disclosed the negative financial facts; his allegation is that the publication of the affirmative present-resource half-truth remained materially misleading despite that disclosure.

76. Plaintiff recognizes the nonfraudulent competing explanation: the 'do anticipate' wording might have been an uncorrected drafting formula, especially because the same reports disclosed going-concern doubt and prospective financing risks. Plaintiff alleges the stronger inference on the particular combination of repeated language across separately approved reports, changes to quantitative liquidity measures, management's express contemporaneous insufficiency determinations, and Regan's disclosed responsibility for reviewing budgets and allocating resources. Whether the wording resulted from mistake or recklessness is a disputed inference, not a claim of access to private communications.

77. Plaintiff distinguishes the challenged description of present funding sources from predictions of successful future financing or eventual pharmaceutical commercialization. To the extent the twelve-month expectation itself is deemed forward-looking, Plaintiff alleges actual knowledge of the existing funding limitation from management's own determinations and the repeated approval of the identified financial reports. He acknowledges that the reports contained

explicit cautions about future financing, including the possibility that funding would not be obtained.

78. The challenged language combines a twelve-month expectation with an affirmative description of its source: cash and cash equivalents already on hand and 'current borrowings.' Plaintiff's theory concerns the asserted present state of those sources, not a guarantee that the Company would raise financing or develop a successful drug. The accompanying statements that management hoped to borrow or sell new equity make clear why the distinction between present liquidity and conditional future financing mattered to a reasonable investor.

## VIII. REVELATION OF FUNDING DEPENDENCE AND LOSS CAUSATION

79. In the third-quarter 2025 Form 10-Q filed November 13, CDT changed the very same Working Capital formulation: after estimating approximately $11.7 million of next-year requirements, it stated, "We do not anticipate being able to fund required working capital for the next 12 months with cash and cash equivalents on hand and current borrowings." The immediately following language continued to contemplate future borrowing and equity raises. This change from 'do' to 'do not,' within the same type of financing discussion, is the alleged partial correction; Plaintiff does not treat every later adverse event as a corrective disclosure. (Form 10-Q, SEC accession 0001493152-25-022373, Working Capital.)

80. The third-quarter report also indicated that, by issuance, all capacity under CDT's existing ATM program had been used; its September 30 Working Capital description separately listed approximately $1.8 million remaining as of that earlier measurement date. The reported change in time and financing availability matters: exhaustion by issuance was not an assertion that no capacity existed on September 30. Plaintiff alleges that the changed current-resource

formulation partially revealed the financing limitation underlying the earlier statements, while recognizing that previous filings had already warned of inadequate liquidity.

81. The SEC submission header records acceptance at 16:46:22 Eastern Time on November 13, after the regular trading close. Accordingly, Plaintiff does not attribute a decline occurring before that release to the report. The first regular trading session after publication was November 14. (SEC submission header for accession 0001493152-25-022373.)

82. Quiver Quantitative's historical as-traded prices show a November 13 close of $2.31, a November 14 open of $2.12, and a November 14 close of $2.23. The close-to-close decline was approximately 3.46%. These are prices in the same share units, with no intervening reverse split. (Quiver Quantitative, CDT historical prices, November 13–14, 2025, retrieved October 13, 2026.)

83. The November 14 opening price of $2.12 was $0.19, approximately 8.23%, below the prior $2.31 close. The stock recovered part of that opening move to close at $2.23, a $0.08, approximately 3.46%, close-to-close decline. Plaintiff pleads both observations because the immediate opening response is temporally consistent with a market reaction to the post-close filing, while the partial recovery and concurrent market influences remain important limitations. The observed trading does not by itself prove the amount of price inflation attributable to the challenged statement.

84. Plaintiff held CDT shares across that report and the following session. His November statement reflects the continuing position and additional purchases, not liquidation before publication. Plaintiff alleges that the identified revelation and the associated reassessment of financing dependence caused a compensable portion of the loss on his affected pre-disclosure purchases. (Schwab November 2025 statement, pp. 3–4; Ex. B, pp. B-7–B-8.)

85. The November Schwab excerpt lists 142 shares purchased on its November 12 entry for $359.26, 113 shares on its November 13 entry for $285.89, and 50 shares on its November 14 entry for $115.00, totaling 305 shares and $760.15 in listed purchases. The November 14 entry does not establish that the order was executed after the November 13 Form 10-Q became public at 4:46 p.m. Eastern; under the usual T+1 settlement cycle it could reflect a November 13 execution, and the excerpt does not label trade and settlement dates separately. The statement reports 2,750 shares at month-end, not the precise holdings immediately before that disclosure. Any compensable exposure will be limited to qualifying purchases and holdings before the correction, with actual execution dates and times, prices, and subsequent proceeds considered. (Ex. B, pp. B-7-B-8.)

86. Plaintiff alleges that the first post-publication trading session's price response reflected, in part, new market assessment of the now-negative current-resource formulation and exhausted ATM availability. The close-to-close change was modest and occurred in the context of CDT's other risks. Plaintiff seeks to prove the portion, if any, attributable to revelation of the same previously misstated condition, rather than to company-independent market movements, unrelated information, ordinary trading volatility, or the mechanical effect of reverse stock splits.

87. Later financing and capitalization events are pleaded as context for the continuing investment outcome. The August accounting reclassification concerned a distinct issue and is not used as a correction of the liquidity statement. Plaintiff does not aggregate unrelated adverse announcements as though each revealed the same alleged misstatement.

88. Plaintiff held CDT shares across the November report and continued to hold a position thereafter. Later averaging-down transactions and the March 2026 position-maintenance purchases are disclosed in the trading chronology. He continues to own three whole shares and

reports a combined value below $0.25 as of November 1, 2026; he has not voluntarily liquidated them.

## IX. SPECIFIC LOSS AND REQUESTED COMPENSATION

89. As of April 30, 2026, Schwab reported a CDT adjusted cost basis of $157,936.59, market value of $1,767.00, and unrealized loss of $156,169.59. These were CDT-specific figures, not the cost basis of the entire account. (Ex. B, p. B-5.)

90. Schwab's September 30, 2026 statement reported $31,977.40 in long-term realized loss and $125,955.03 in unrealized loss on the carried CDT position. The combined reported loss was $157,932.43. The three remaining shares were valued at $4.08. (Ex. B, pp. B-1–B-3.)

91. The September total reconciles to the earlier $157,936.59 adjusted CDT basis, less $0.08 in cash-in-lieu proceeds and $4.08 in remaining value. Plaintiff now reports that the three shares together are worth less than $0.25. On that reported valuation, with no intervening transaction or basis adjustment, the corresponding basis-minus-proceeds-and-value loss exceeds $157,936.26. This is a calculation using the broker-reported baseline and Plaintiff's updated valuation, not a later certification by Schwab.

92. The brokerage record includes material sales and repurchases before December 2025 and limited position-maintenance purchases in March 2026. Plaintiff does not contend that each accounting dollar lost was caused by the alleged financing half-truth. Qualifying purchases must be evaluated by execution date, the information then public, shares retained across the alleged corrective event, realized proceeds, wash-sale or basis adjustments, and the portion of price movement attributable to that event. Purchases made after a corrective disclosure are not attributed to inflation removed by that earlier disclosure. The statutory PSLRA 90-day mean-price limit and other applicable offsets will be applied to any recoverable loss.

93. The cited $157,932.43 brokerage figure aggregates trading and position-accounting outcomes over a much longer period than the November 2025 reaction. It is evidence that Plaintiff sustained substantial economic loss, but not an allegation that all of that loss is recoverable under federal securities law. The Court may award only a provable portion causally linked to qualifying actionable statements, subject to the statutory price rules and no double recovery.

94. Plaintiff seeks recovery for losses caused by the actionable misrepresentations, measured on his qualifying purchases and retained holdings under the applicable damages rules. The $157,932.43 September accounting loss and the updated calculation exceeding $157,936.26 describe successive valuations of the same carried position; they are not cumulative demands. The recoverable amount will reflect the transaction history, required offsets, and fraud-related price effects.

## X. COUNT I — SECTION 10(b) AND RULE 10b-5(b)

(Against CDT Equity Inc. and Andrew Regan as specified below)

95. Plaintiff incorporates paragraphs 1–94 to the extent relevant to this count. CDT is responsible for the identified annual and quarterly reporting and Company communications. Regan is sued directly under this count for the May and August 2025 reports he personally signed, reviewed, and certified after becoming CEO, not for the pre-appointment April 10 statement.

96. The challenged affirmative funding language is identified in paragraphs 33, 42–43, and 45–46, together with the contemporaneous liquidity assessments and surrounding qualifications. Plaintiff alleges that the present-resource component materially misrepresented CDT's funding capacity. As CEO and principal executive officer, Regan approved and signed the quarterly

reports and certified his review and disclosure-control responsibilities. Plaintiff alleges that he exercised authority over their content and public issuance and was a maker of those identified statements. CDT made the statements through its authorized officers.

97. For the reasons alleged in paragraphs 68–77, Plaintiff alleges that the responsible officers, including Regan for the May and August reports, acted knowingly or with severe recklessness concerning the misleading present-resource component. Management's own determinations of insufficient liquidity supply the contemporaneous basis for that allegation; the inference does not depend on the subsequent stock-price decline alone.

98. Plaintiff personally read the May 15, 2025 first-quarter Form 10-Q before purchasing additional CDT shares. He relied on its presentation of financing, available capital and liquidity, considered with the repurchase program, Regan's leadership and relationships, the pharmaceutical development and licensing narrative, and the overall financial disclosures. He alleges that the identified positive current-resource presentation materially affected his assessment of CDT's capacity to pursue the represented business strategy and contributed to his post-filing purchases. His reliance on the April 10 repurchase communication and the successive purchase groups are described in paragraphs 14–22; the challenged financial statements themselves are identified in paragraphs 33 and 42–46.

99. Plaintiff alleges that the specified financial statements materially misled qualifying investors, including him, and that the November 2025 change and market reassessment caused an identifiable portion of loss on qualifying pre-correction shares held through that event. These allegations concern the particular statements, makers, timing and causal theory detailed in paragraphs 32–87, not a claim for the entire later decline merely because he continued to own

stock. The charged conduct violated Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5(b), 17 C.F.R. § 240.10b-5(b).

## XI. COUNT II — SECTION 20(a) CONTROLLING-PERSON LIABILITY

*(Against Andrew Regan)*

100. Plaintiff incorporates paragraphs 1–99 to the extent relevant to this count. The predicate violation is CDT's violation alleged in Count I; this count does not assert an independent violation merely because Regan held office.

101. Regan served as chief executive officer from April 15, 2025 until James Bligh's August 31, 2026 appointment and was a director during the relevant reporting period. He signed the May and August reports containing the challenged language and certified responsibility for disclosure controls. Plaintiff alleges that those responsibilities and personal reporting acts gave him power to direct CDT's financial reporting and the publication of the challenged quarterly disclosures.

102. Plaintiff confines this count to the Company's allegedly actionable reporting while Regan exercised control. He does not attribute the pre-appointment April 10 quotation to Regan, and he does not treat post-August 2026 issuances, including October 2026 dealings involving Regan, as proof of his control over later Company management.

103. Regan personally approved the identified quarterly reporting while management's own insufficiency assessments appeared in the same documents. On the particular facts alleged in paragraphs 68–77, Plaintiff alleges that Regan participated in the misleading presentation and did not act in good faith with respect to the predicate violation.

104. To the extent CDT is liable for the predicate violations during that period, Regan is liable as a controlling person under 15 U.S.C. § 78t(a), jointly and severally with the controlled

person to the extent provided by that statute. Plaintiff seeks one recovery for the same loss, not duplicative damages under Counts I and II.

## XII. COUNT III - SECTION 18(a) OF THE SECURITIES EXCHANGE ACT

(Pled in the alternative against CDT Equity Inc. and Andrew Regan)

105. Plaintiff incorporates the foregoing allegations to the extent relevant to this alternative count and asserts a distinct statutory basis under Section 18(a), 15 U.S.C. § 78r(a), for the allegedly materially misleading statement in CDT's first-quarter 2025 Form 10-Q filed with the Securities and Exchange Commission on May 15, 2025 (accession 0001641172-25-010405). Plaintiff does not assert Section 18 liability based solely on an unfiled press release or on a later report he cannot say he personally read before a purchase.

106. The filed report estimated approximately $12.7 million in cash needs and affirmatively represented that cash on hand and current borrowings were expected to cover that amount for the next twelve months, while the same report identified approximately $2.1 million in quarter-end cash and stated management had determined that its existing liquidity could not fund the business plan and more financing was needed. Plaintiff alleges that the positive description of already-available financing resources was materially false or misleading for the contemporaneous reasons identified above. He acknowledges the simultaneous adverse disclosures and asks the Court to consider the statement in the entire report.

107. Before making further purchases following the public filing, Plaintiff personally read the May 2025 Form 10-Q and relied upon its Working Capital discussion concerning existing funding resources. He regarded the affirmative current-resource description as significant to his decisions to add CDT shares and was unaware that the statement was allegedly misleading. He

alleges actual reliance on the filed financial presentation, not merely a presumed efficient-market reliance or hindsight reconstruction of his earlier February and April purchases.

108. The Company's report was publicly filed and available to the United States trading market, and Plaintiff alleges that the material statement affected the market prices at which he made qualifying post-filing purchases. He held affected pre-correction shares across the subsequent November 13, 2025 partial correction, which was followed by the November 14 price movement described above. Plaintiff claims only such resulting economic loss, if any, as is attributable to the challenged filed statement, after appropriate offsets and statutory restrictions.

109. CDT caused the first-quarter report to be filed, and Regan signed it as chief executive officer and executed the related principal-executive certification. Plaintiff alleges that each Defendant made or caused to be made the challenged statement within the meaning of Section 18(a). This count is pleaded in the alternative to Count I, subject to the statute's good-faith defense and other requirements, and seeks no duplicative recovery.

## XIII. PRAYER FOR RELIEF AND JURY DEMAND

110. WHEREFORE, Plaintiff requests judgment against Defendants for: (a) actual compensatory damages in an amount established by the evidence, including recoverable loss on Plaintiff's CDT purchases and retained shares, with the September 30 accounting loss of $157,932.43 and updated position-accounting calculation exceeding $157,936.26 described in paragraphs 89–94; (b) prejudgment interest as permitted by law; (c) postjudgment interest under 28 U.S.C. § 1961; (d) taxable costs; and (e) other nonduplicative relief authorized by law. Plaintiff seeks one recovery for each compensable loss, not duplicate recovery under the alternative statutory counts.

111. Plaintiff demands trial by jury on all issues triable by jury under Federal Rule of Civil Procedure 38.

Respectfully submitted,

Cortney D. Tanner
Plaintiff, pro se
P.O. Box 9669
Dyess Air Force Base, TX 79607
Telephone: 325-428-8902
Email: CortTanner@protonmail.com

Date: 5 NOV 2026

Cortney D. Tanner, Plaintiff, pro se
P.O. Box 9669
Dyess Air Force Base, TX 79607
Telephone: 325-428-8902
Email: CortTanner@protonmail.com

RECEIVED
NOV - 5 2026
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Clerk of the United States District Court
Northern District of Texas — Abilene Division
341 Pine Street, Room 2008
Abilene, TX 79601-5928

**Re: Cortney D. Tanner v. CDT Equity Inc. and Andrew Regan**

Submission of Initial Civil Complaint and Application to Proceed IFP

Dear Clerk of Court:

Enclosed for filing in the Abilene Division is my initial civil complaint and jury demand, together with the following accompanying materials:

1. Civil Cover Sheet (JS 44);
2. Application to Proceed Without Prepaying Fees or Costs (AO 239), with supplement;
3. Separately signed Certificate of Interested Persons / Disclosure Statement;
4. Proposed summons (AO 440) for CDT Equity Inc.;
5. Proposed summons (AO 440) for Andrew Regan (after service address is supplied);
6. Exhibits A and B, if submitted with the complaint, and required paper copies.

I request assignment of a civil action number and judicial review of the AO 239 application. I understand that the Clerk will not issue summonses before the Court authorizes issuance where the filing fee is not prepaid. I will provide any additional copies or information requested under the Court's filing procedures.

Respectfully submitted,

[signature]

Cortney D. Tanner, Plaintiff, pro se

5 NOV 2026